*823
 
 Opinion
 

 DOSSEE, J.—
 

 Introduction
 

 Ramon Garcia appeals from his conviction of second degree murder (Pen. Code, §§ 187, 189),
 
 [1]
 
 assault with a firearm (§ 245, subd. (a)(2)), and weapon use enhancements for both counts (§ 12022.5). Appellant asserts several contentions regarding the need for a jury finding pursuant to section 190, former subdivision (c) (hereafter section 190(c)), which imposes a sentence of 20 years to life for a second degree “drive-by” murder.
 
 [2]
 
 We determine that section 190(c) is not a substantive crime and that the failure to obtain a jury finding on the element of intent to inflict great bodily injury was harmless.
 

 Appellant also argues that the adult criminal court had no jurisdiction over him because the juvenile court had no power to accept his waiver of a fitness hearing pursuant to Welfare and Institutions Code section 707. In addition, he argues that the trial court failed to realize it had discretion to strike the firearm use enhancement. We determine that appellant may not raise his argument regarding the fitness proceeding in this appeal. Appellant’s other contentions have no merit, and we affirm the judgment.
 

 I
 

 Background
 

 On the evening of February 7, 1995, a car with five people inside drove by the Chevron gas station where Elias Cardenas, Servando Renteria, and David Ortiz were picking up Cardenas’s truck. Some gang signals were exchanged, the car made three passes by the gas station, with the occupants waving a red rag, and three shots were fired from the rear passenger seat. Renteria was killed by a bullet in the chest, and Ortiz was wounded by a bullet that passed through his foot. The car sped away.
 

 Within the first couple of weeks after the shooting, the police had no leads. In March of 1995, Detective John McFadden learned that Valerie Garrison could identify the occupants of the car. Valerie and her friend, Mike Gooding, described the events of that night and told the police that
 
 *824
 
 either Randy Chalmers or appellant fired the gun. Appellant, who would turn 18 years old on June 12, 1995, was arrested and charged in a juvenile court petition with the murder of Renteria (§ 187), the attempted murder of Ortiz (§§ 187, 664), weapon use enhancements on both victims (§ 12022.5), and intimidating the witnesses (§ 137, subd. (b)).
 
 [3]
 

 On May 31, 1995, appellant appeared with counsel for a fitness hearing. At that time, appellant orally waived the fitness hearing. The court then found that appellant was not a fit subject for the juvenile court system, that the offense was an offense described in Welfare and Institutions Code section 707, subdivisions (b) and (c), and that appellant was 16 years of age or older at the time of the commission of the offense.
 

 A felony complaint was filed in municipal court on June 1, 1995, charging appellant with the murder of Servando Renteria, and attempted willful, deliberate, premeditated murder of David Ortiz, with personal firearm use allegations as to both charges. The complaint also alleged attempts to intimidate witnesses Garrison and Gooding. The preliminary hearing was held on August 3 and 4, 1995, after appellant’s 18th birthday. The matter was certified to the superior court on all charges.
 

 On August 17, 1995, an information was filed charging appellant in count one with the murder of Renteria (§ 187), with a further allegation that the murder was perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person outside of the vehicle with the intent to inflict death. Count one was also enhanced with a firearm allegation (§ 12022.5). Count two charged appellant with the attempted murder of Ortiz by means of an assault with a firearm (§§ 187, 664). Count two was enhanced with allegations of personal use of a firearm (§ 12022.5) and personal infliction of great bodily injury (§ 12022.7). Counts three and four charged appellant with dissuading a witness by force or threat as to Garrison and Gooding. Appellant pled not guilty and denied the enhancements.
 

 At the trial, David Ortiz testified that he was with Cardenas and Renteria at a Chevron gas station in Benicia to pick up Cardenas’s truck. All three men were in the Job Corps, and Cardenas was wearing his blue Job Corps jumpsuit. Cardenas went to pay for his truck and Ortiz and Renteria walked
 
 *825
 
 to a nearby bank. While they were standing in front of the bank, Ortiz saw a car driving from the bank toward the gas station. There were five people inside, who were “mad-dogging,” or giving hard looks to Ortiz and Renteria. Ortiz believed they were trying to start a fight. Renteria raised his arms about shoulder height in a gesture that meant “What’s up?” which is a way of asking if they wanted to fight. The car continued down the street and Ortiz and Renteria went back to the gas station. As they walked, they saw the car returning and Ortiz felt they were going to start a fight. Suddenly, the car made a U-turn and came closer to the sidewalk, while increasing its speed. Ortiz grabbed a metal bicycle pedal and crank from Cardenas’s truck and started to walk towards the car. Cardenas and Renteria were behind him, and he could not see them. Ortiz saw someone reaching out from the back on the passenger side of the car holding a gun. When he was approximately 16 feet from the car, he could see a red rag waving, and thought he heard 5 shots. Ortiz was hit in the foot, and he fell. He threw the bicycle crank towards the car as it fled. Ortiz turned back and saw Renteria’s sweater soaked with blood. Renteria tried to run, but collapsed and later died of a single bullet wound to the heart.
 

 The witnesses at trial testified to essentially the same facts. On the night of the shooting, Valerie Garrison and Mike Gooding were riding in a car which belonged to Randy Chalmers. George Kokolios was driving, Valerie was in the middle, and Randy was on the passenger side of the front seat. Mike Gooding sat in the backseat behind the driver, and appellant sat behind the passenger side. As they passed the gas station, they saw two men who both raised their arms in a “what’s up?” gesture. Valerie and George testified that Randy told George to turn the car around. Randy admitted that he told George to turn around after Valerie said, “Are you going to let that guy punk you like that?” Randy testified that only appellant said not to turn back.
 

 The witnesses agreed that, as they made another pass by the gas station, Randy was either leaning out the passenger window or sitting in the open window. Randy was waving a red rag that he had gotten from appellant. Randy and appellant denied the red rag existed. The color red was the color the Norteños gang claimed as its own. Mike testified that appellant was a gang member and that he claimed red, which appellant denied. Valerie and Mike testified that one of the men in the gas station began running towards the car. Valerie couldn’t see anything in his hand, but Mike thought he had a bottle in his hand. George thought he heard a bottle break. Randy testified that the man running at the car had something in his hand which he threw at the car. Appellant testified that he thought the man running had a gun.
 

 Everyone agreed that shots were fired out of the passenger side window. Valerie and Mike testified that appellant pulled out the gun and leaned
 
 *826
 
 forward from the backseat to fire the gun out the front window. Mike testified that appellant told Randy, “Move your arm. It’s in the way.” Appellant then fired three shots out the front passenger window. George Kokolios, the driver, testified that he heard appellant tell Randy to “look out” just before the shots were fired. Immediately after the shots were fired, Randy told appellant “that was right in my ear.” George looked back and saw appellant with a gun. Appellant testified that Mike handed him the gun and that he pointed it out the window to scare the man that was running towards the car. According to appellant, he “froze up,” and Randy took the gun from him. Appellant heard shots but did not know who fired the gun.
 

 After the shots were fired, the car sped away. George drove to the freeway and exited where Randy directed. Appellant said they needed to hide the gun; Randy wrapped it in a shirt and hid it behind a fence in a trailer park. According to Valerie, appellant put grease from the engine on his hands to hide any residue from shooting the gun. Appellant warned the others not to say anything about the shooting. Valerie testified that appellant and his brother later threatened the occupants of the car and their families if anyone said anything about the shooting.
 

 On May 6, 1996, the jury returned a verdict on count one of not guilty of first degree murder, but found appellant guilty of the second degree murder of Renteria. The jury also found that appellant personally used a firearm in connection with the murder. On count two, the jury acquitted appellant of attempted murder and convicted him of the lesser included charge of assault with a firearm (§ 245, subd. (a)(2)). The jury found the firearm enhancement and a great bodily injury enhancement to be true as to David Ortiz. (§§ 12022.5, 12022.7.) The jury found that appellant was not guilty of the two counts of dissuading witnesses.
 

 Appellant was sentenced in June of 1996. The probation department submitted a presentence report which recommended, in part, that appellant be sentenced to the term of 20 years to life on count one, pursuant to the newly enacted statute describing the sentence for second degree drive-by murder. (§ 190(c); Stats. 1993, ch. 609, § 3: approved by the voters (Prop. 179), eff. June 8, 1994.) Counsel for appellant objected to the court’s use of section 190(c), arguing that the jury had made no finding under that section. The court heard arguments on sentencing and concluded that section 190(c) did not need to be pleaded or proven, but was a sentencing factor for the court to decide; The court determined that there was sufficient evidence to show that appellant had shot from a vehicle at a victim outside the vehicle and that the evidence “conforms to Penal Code Section 190(c).” Appellant was sentenced to a total term of 31 years to life. The sentence on count one,
 
 *827
 
 in addition to the 20 years to life term, included an additional consecutive midterm of 4 years for the firearm enhancement. On count two, the court imposed a consecutive three-year midterm for assault with a firearm and another consecutive four years for the firearm enhancement.
 
 [4]
 
 The court ordered restitution fines pursuant to sections 1202.4 and 1202.45. Appellant filed a timely notice of appeal.
 

 II
 

 Discussion
 

 *
 

 *
 

 A.
 
 Issues Raised Regarding Juvenile Fitness Hearing Are Not Subject to Review on
 

 *
 

 B.
 
 Second Degree Murder Perpetrated by Shooting From a Vehicle Is Not a Substantive Crime
 

 Section 190(c) provides: “Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury.” Appellant argues that section 190(c) articulates a new crime of second degree drive-by murder, and that the failure to instruct the jury on the offense requires reversal per se pursuant to
 
 People
 
 v.
 
 Cummings
 
 (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1]. Respondent contends that section 190(c) is merely a penalty provision, with no requirement of pleading or proof, and that any error is harmless under
 
 People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818, 836 [299 P.2d 243],
 

 Several opinions of our Supreme Court have set out guidelines for determining whether a particular statutory provision is a substantive
 
 *828
 
 offense, or an enhancement or penalty provision.
 
 [7]
 
 In
 
 People
 
 v.
 
 Hernandez
 
 (1988) 46 Cal.3d 194 [249 Cal.Rptr. 850, 757 P.2d 1013] (disapproved on another point in
 
 People
 
 v.
 
 King
 
 (1993) 5 Cal.4th 59, 78, fn. 5 [19 Cal.Rptr.2d 233, 851 P.2d 27]), the court held that section 667.8 was an enhancement. At that time, section 667.8 provided for an additional term for any person convicted of various sex offenses where the defendant kidnapped the victim for the purpose of committing the sex offense.
 
 (People
 
 v.
 
 Hernandez, supra,
 
 46 Cal.3d at pp. 207-208.) The
 
 Hernandez
 
 court noted that the fact that a statute includes an element in addition to the elements of the underlying crime does not imply that the statute defines a new crime.
 
 (Id.
 
 at p. 207.) The court observed: “Enhancements typically focus on an element of the commission of the crime or the criminal history of the defendant which is not present for all such crimes and perpetrators and which justifies a higher penalty than that prescribed for the offenses themselves.”
 
 (Id.
 
 at pp. 207-208.) Viewed from this perspective, the instant provision merely focuses on shooting from a vehicle as an element of the commission of some second degree murders, which is not present for all such crimes, and for which a higher penalty is imposed. Cases decided after
 
 Hernandez
 
 strengthen our conclusion that the instant statute provides for a penalty provision rather than a substantive crime.
 

 In
 
 People
 
 v.
 
 Rayford
 
 (1994) 9 Cal.4th 1 [36 Cal.Rptr.2d 317, 884 P.2d 1369], the court noted it is not dispositive that a statute imposes a single term of imprisonment rather than a choice of three terms, since the Legislature has drafted enhancement provisions that impose a range of possible terms.
 
 (Id.
 
 at p. 9.) In
 
 Rayford,
 
 the court considered section 208, which provides the punishment for kidnapping. At that time, subdivision (d) stated that kidnapping with the intent to commit rape or other sex crimes was punishable by imprisonment in the state prison for five, eight or eleven years. (9 Cal.4th at p. 8, fn. 2.) The court concluded that section 208, subdivision (d) is a separate offense from simple kidnapping. (9 Cal.4th at p. 8.) In reaching this conclusion, the court looked first to the words of the statute, then to the legislative history of the section, the way the statute was treated in other related code sections, and the fact that the Legislature itself expressly characterized the section as a separate crime.
 
 (Ibid.)
 

 The
 
 Rayford
 
 court determined that the language of section 208, subdivision (d) did not contain the words “additional term” or “enhancement” and
 
 *829
 
 imposed a sentence similar to the sentence imposed for a substantive crime.
 
 [8]
 

 (People
 
 v.
 
 Rayford, supra,
 
 9 Cal.4th at pp. 9-10.) The court then noted that a senate floor analysis characterized kidnapping for purposes of committing sexual offenses as a separate felony, and referred to persons being “found guilty” or “convicted” of kidnapping for purposes of rape on multiple occasions.
 
 (Id.
 
 at pp. 10-11.) The court also noted that the Legislature had created a different separate enhancement for kidnapping the victim of a sexual assault.
 
 (Id.
 
 at p. 8.) In addition, the Legislature, in the then recently enacted section 667.61, referred to section 208, subdivision (d) as a separate crime. (9 Cal.4th at p. 8.) In referring to the legislative history, the court noted that the bill was originally introduced as an amendment to section 209 (kidnapping for ransom, extortion or reward) for the express purpose of making the penalty for kidnapping for sex crimes equal to that of other forms of aggravated kidnapping. (9 Cal.4th at p. 10.) The bill was moved to a different section indicating a change of intent. In various documents analyzing the bill, the court found references to those “convicted” of kidnapping for rape and no references to an enhancement.
 
 (Id.
 
 at pp. 10-11.) All of these considerations convinced the court that section 208, subdivision (d) was intended to create a new crime.
 

 Subsequently, in
 
 People
 
 v.
 
 Bright, supra,
 
 12 Cal.4th 652, the court examined section 664, which describes the punishment for attempts. Subdivision (a) provides if the offense attempted is willful, deliberate and premeditated murder, the punishment is life imprisonment with the possibility of parole. (12 Cal.4th at pp. 655-656.) Unlike
 
 Rayford,
 
 the
 
 Bright
 
 court found the provision to be a penalty provision, rather than a separate, greater degree of attempted murder.
 
 (Id.
 
 at pp. 656-657.) The court discussed the basic characteristics of an enhancement, including the fact that it adds a penalty where an offense is committed under specified circumstances, it does not set out the elements of the offense, and the jury does not decide the truth of a penalty allegation until it has reached a verdict on the substantive offense. Unlike the provision in
 
 Rayford,
 
 the attempted murder provision in
 
 Bright
 
 utilized the words “additional term” and contained an express requirement that the added elements be “charged” and “admitted or found to be true by the trier of fact,” which are typical words used in a penalty provision, but are not necessary for a substantive crime.
 
 (Id.
 
 at p. 667, italics omitted.)
 

 Aside from the grammatical differences between the
 
 Rayford
 
 and
 
 Bright
 
 statutes, the main distinguishing factor was the court’s analysis of the
 
 *830
 
 legislative intent in enacting the statute under consideration.
 
 (People
 
 v.
 
 Bright, supra,
 
 12 Cal.4th at pp. 662-669.) The
 
 Bright
 
 court examined the law prior to the amendment at issue and concluded that it was recognized generally that attempted murder was not divided into degrees.
 
 (Id.
 
 at pp. 662-664.) The court noted that the statute did not impose a higher penalty for all types of attempted first degree murder, but only for willful, deliberate and premeditated attempted murder, which indicated a lack of intent to create a new crime of attempted first degree murder.
 
 (Id.
 
 at p. 668.) Based on its analysis of the history and intent behind the statute, as well as the wording of the provision itself, the court determined that the creation of a new crime should not be implied in the absence of clear legislative intent.
 
 (Id.
 
 at pp. 666-667.) Finding no indication of such an intent, the court determined that the provision was merely an increased penalty.
 

 Turning to the provision at issue in this case, we note that prior to the enactment of Senate Bill No. 310 (1993-1994 Reg. Sess.) which added the drive-by provisions to the Penal Code, subdivision (a) of section 190 provided that the punishment for second degree murder was 15 years to life, except in subdivision (b), if the defendant reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties. Under that circumstance, the penalty is 25 years to life. While not expressly deciding the issue, courts have stated that the purpose of subdivision (b) was to “increase the minimum term of persons convicted of second degree murder of specified police officers. . . .”
 
 (In re Oluwa
 
 (1989) 207 Cal.App.3d 439, 446 [255 Cal.Rptr. 35], italics omitted;
 
 People
 
 v.
 
 Gonzalez
 
 (1990) 51 Cal.3d 1179, 1219, fn. 14 [275 Cal.Rptr. 729, 800 P.2d 1159] [provision “enhanced” the punishment].) This perception of subdivision (b) is echoed by its treatment in CALJIC No. 8.35 (6th ed. 1996 bound vol.) as a “special finding”, which is made after the determination of guilt of second degree murder, apparently for the purpose of sentencing.
 
 [9]
 
 We assume the Legislature knew of this treatment of subdivision (b) when it enacted subdivision (c). This element of determining the special finding after a finding of guilt was one of the elements the court in
 
 Bright
 
 noted as a characteristic of a penalty provision.
 

 Like the provision in
 
 Bright,
 
 section 190(c) provides an increase in the minimum term for the specified crime when the crime is committed under particular circumstances. It does not set out the elements of the crime, but focuses on a circumstance which is not present for all such crimes. In
 
 People
 
 v.
 
 Hernandez, supra,
 
 46 Cal.3d at pages 207-208, and
 
 People
 
 v.
 
 Wims
 
 (1995) 10 Cal.4th 293 [41 Cal.Rptr.2d 241, 895 P.2d 77], the Supreme Court has noted that this factor is characteristic of enhancements or penalty provisions. “Rather, section 12022(b) merely focuses on a circumstance involved in the
 
 *831
 
 commission of some felonies (i.e., use of a ‘deadly or dangerous weapon’) that the Legislature apparently believed justifies an additional penalty to that prescribed for the underlying felonies. Thus, as we have previously recognized in analogous circumstances, section 12022(b) articulates a penalty provision, not a substantive crime. [Citations.]”
 
 (People
 
 v.
 
 Wims, supra,
 
 10 Cal.4th at pp. 293, 305, italics deleted.)
 

 The legislative history of section 190(c) indicates that the measure was part of a group of amendments concerned with drive-by shootings.
 
 [10]
 

 (People
 
 v.
 
 Ledesma
 
 (1997) 16 Cal.4th 90, 100 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) Senate Bill No. 310, as approved by the Governor in 1993, added a new crime of first degree drive-by murder, increased the penalty for second degree murder perpetrated by a drive-by shooting, and provided that the additional term in section 12022.5 for use of a firearm could be imposed where the underlying crime was a murder perpetrated by a drive-by shooting. (Sen. Bill No. 310,
 
 supra;
 
 Stats. 1993, ch. 609, §§ 1-3.) The Governor’s lengthy signature message provides, in part, as follows: “ ‘This bill adds intentional drive-by killing to the first degree murder statute and increases the penalty for second degree drive-by murder by five years to twenty years to life. Additionally, this bill imposes a sentence enhancement of up to five years for the use of the firearm, [¶] This bill represents substantial progress in the effort to curb and punish senseless acts of violence perpetrated on innocent, and often random, victims, [¶] The codification of drive-by killing in the first degree murder statute allows prosecutors to convict drive-by assassins upon proof of a specific intent to kill. The penalty for this act of cowardice in the first degree can be as high as 30 years to life with the application of the penalty enhancement provided in this bill, [¶] For second degree drive-by murder, this bill
 
 increases the penalty
 
 from 15 years to life to as high as 25 years to life with application of the penalty enhancement provided in this bill.’ ” (Historical and Statutory Notes, 47 West’s Ann. Pen. Code (1998 supp. pamp.) § 189, p. 157, italics added.)
 

 The arguments in the 1994 voters pamphlet regarding section 190(c) were brief and to the point.
 
 [11]
 
 The analysis by the legislative analyst explained that there are two degrees of murder, first degree, which is planned in advance or takes place during other specified
 
 *832
 
 circumstances, and second degree, which is all other types of murder.
 
 [12]
 
 The legislative analyst’s description of Proposition 179 stated: “This measure increases the penalty for second degree murder resulting from a ‘drive-by shooting’ (shooting someone from a motor vehicle) to imprisonment for 20 years to life, instead of 15 years to life, with the possibility of parole.” (Ballot Pamp., Primary Elec. (June 7, 1994) p. 22.) The argument in favor of the proposal noted that the Governor had signed legislation making it easier to prosecute drive-by killers for first degree murder, and that “[t]o strengthen the law further, since prosecutors still may not be able to obtain first degree murder convictions against drive-by assassins,
 
 we now need to raise the minimum penalty
 
 for second degree drive-by murder by five years.”
 
 (Id.
 
 at p. 23, italics added.)
 

 Reading the language of the entire bill, along with the history of the enactment, and the fact that the voters were told only that they were voting to increase a minimum penalty, we have no basis on which to determine that section 190(c) is anything other than a penalty provision. The Legislature was apparently concerned that many drive-by killings were punished only as second degree murder due to the difficulty in proving premeditation. The remedy proposed was to make it easier to prove first degree murder and to increase the penalty for those crimes that still could not be elevated to the status of first degree. The Legislature drafted a multipart bill, which did three things: (1) It added a new crime of drive-by first degree murder (with intent to kill); (2) it increased the penalty for second degree murders which were perpetrated by shooting from a vehicle (with intent to inflict great bodily injury); and (3) it provided for the imposition of an enhancement for drive-by killings (with intent to inflict great bodily injury or death). The voters were told expressly that a “yes” vote would raise the minimum penalty for second degree drive-by murder. We will not upset the understanding of the voters or the legislative structure by inferring, without support, the creation of a new crime.
 

 C.
 
 Failure to Obtain a Jury Finding on the Drive-by Element Is Harmless
 

 Appellant, relying on
 
 People
 
 v.
 
 Hernandez, supra,
 
 46 Cal.3d 194, argues that even if section 190(c) is a penalty provision, the failure to submit the issue to the jury requires reversal. The Attorney General argues that there
 
 *833
 
 is no statutory requirement that the issue be submitted to the jury, and that even if there were such a requirement, any error is harmless.
 
 [13]
 
 Appellant is correct that the court in
 
 Hernandez
 
 concluded that the failure to provide for an express statutory requirement of pleading and proof for the penalty enhancement at issue was a legislative oversight. (46 Cal.3d at p. 207.) Although we agree with the determination in
 
 Hernandez
 
 that the jury herein should have been instructed on the penalty provision we do not find the circumstances of the instant case require reversal. Unlike the defendant in
 
 Hernandez,
 
 appellant here does not claim a lack of notice of the drive-by enhancement. In his brief on appeal, appellant concedes that the pleading and proof of the first degree drive-by allegations put him on notice of the potential applicability of the second degree drive-by provision. The complete lack of notice that a particular mental state was at issue, which was the basis for the court’s reversal in
 
 Hernandez,
 
 is not present in the instant case, and a different standard for assessing prejudice applies here.
 
 [14]
 

 Although we do not usually assume the Legislature committed an oversight in failing to include an express statutory requirement for pleading the second degree drive-by allegations, neither do we agree with respondent that the elements of the special drive-by allegation are merely sentencing facts, such as those found in California Rules of Court, rules 414 and 433. The Legislature has been clear in the past, when describing sentencing facts. (See, e.g., §§ 1170.7-1170.89, expressly stating various circumstances which shall be considered circumstances in aggravation of crime.) Regardless of the lack of an express statutory instruction regarding pleading and proof, we find that the jury should have been instructed on the penalty provision.
 

 “ ‘Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury’s understanding of the case. . . .’ [Citation.] This is true regardless of whether the instruction pertains to a crime, a defense, an enhancement, or a ‘penalty
 
 *834
 
 provision.’ ”
 
 (People
 
 v.
 
 Jones
 
 (1997) 58 Cal.App.4th 693, 709 [68 Cal.Rptr.2d 506].) “Moreover, since we are considering a penal application of ... a statute whose language is susceptible of two constructions, the court must ordinarily adopt the construction more favorable to the offender. ‘The defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.’ [Citations.]”
 
 (People
 
 v.
 
 Simon
 
 (1995) 9 Cal.4th 493, 517-518 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) In the absence of any express legislative direction, we determine that the most likely intent regarding the question of pleading and proof of this penalty provision is that the drive-by allegation should be submitted to the trier of fact as a special finding, as is the apparent practice with the similar provisions of section 190, subdivision (b) regarding second degree murder of a peace officer. (CALJIC No. 8.35 (6th ed. 1996 bound vol.) p. 418.)
 

 Even though we determine that the issue should be submitted to the trier of fact, to make a finding that a second degree murder “was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury” (§ 190(c)), an error in failing to do so is judged under the rule of
 
 People
 
 v.
 
 Watson, supra,
 
 46 Cal.2d 818. There is no constitutional right to a jury trial on a sentence enhancement, and penalty provisions are no different in this respect.
 
 (People
 
 v.
 
 Vera
 
 (1997) 15 Cal.4th 269, 274 [62 Cal.Rptr.2d 754, 934 P.2d 1279].) Like the defendant in
 
 Vera,
 
 appellant makes no claim that he was denied a fair trial, only that he was denied a jury finding on whether the great bodily injury clause of the drive-by allegation was true. Appellant received a fair trial of the issue by the court, which heard all of the evidence. As explained in
 
 People
 
 v.
 
 Wims, supra,
 
 10 Cal.4th 293, when state standards alone are violated, the test of prejudice is whether “it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.”
 
 [15]
 

 (People
 
 v.
 
 Watson, supra,
 
 46 Cal.2d at p. 836.) Applying the
 
 Wims
 
 standard, we conclude that appellant was not harmed by the court’s imposition of the increased penalty.
 

 In reviewing the record of the trial, we note first that appellant expressly does not challenge the trial court’s finding that he personally killed Renteria “by means of shooting a firearm from a motor vehicle, intentionally at another person . . . .” (§ 190(c).) He challenges only the finding that he intended to inflict great bodily injury. Three witnesses testified that appellant leaned forward from the backseat, put his hand out the front window,
 
 *835
 
 pointed the gun in the direction of the three men standing in the gas station, and fired off three quick shots. The witnesses heard appellant tell Randy to get out of his way. Mike testified that appellant said, “Move your arm. It’s in the way,” which evidences the fact that appellant was looking where he was shooting. Mike could see the three men in the station and testified that appellant pointed the gun at them. Ortiz and Renteria were standing together when the car drove up. Ortiz began walking towards the car and was about 16 feet from the curb when he was shot. Renteria was behind him, about 19 feet back from the curb. Only appellant testified that he did not fire the gun, but even appellant admitted that he pointed it out the window. The prosecution expert on gang behavior testified that throwing a gang sign at an opposing gang member, particularly in the presence of a girlfriend, is a sign of disrespect that will bring a violent response. The expert’s testimony established a motive for harming both victims. In reviewing a hypothetical question concerning the facts of the instant encounter, the expert explained that the victims had challenged appellant and his friends, and the motive for the shooting was a “pay-back” for the disrespect. The jury was instructed on personal use of a firearm as to both counts. It was also instructed on the great bodily injury enhancement alleged in connection with the shooting of Ortiz, and it found that appellant possessed the requisite intent to inflict such injury. (§ 12022.7.)
 
 [16]
 
 The trial judge specifically found that appellant intended to inflict great bodily injury on Renteria, and this finding was supported by the evidence.
 

 Although the jury apparently did not believe that appellant specifically intended to kill, it made express findings that when he pointed the gun out the window and pulled the trigger, he intentionally inflicted great bodily injury on Ortiz. In light of all the evidence, including the evidence that the gang “pay-back” motive was the same as to both victims, the fleeting nature of the event, the quick succession of the shots fired, and the fact that the victims were standing in essentially the same location, we find no reasonable probability that the jury would have found appellant harbored a different intent for each of his three quick shots. We cannot conclude that further instructions on the drive-by allegation would, to a reasonable probability, have resulted in a more favorable outcome for appellant.
 

 D„
 
 *
 

 
 *836
 
 Conclusion
 

 The judgment is affirmed.
 
 [18]
 

 Stein, Acting P. J., and Swager, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied August 12, 1998.
 

 [1]
 

 Unless otherwise indicated, all statutory references are to the Penal Code.
 

 [2]
 

 1997 amendments to section 190 redesignated subdivision (c) to be subdivision (d). (Stats. 1997, ch. 413, § 2; notes foil. Deering’s Ann. Pen. Code (1998 pocket supp.) § 190, p. 34.)
 

 [3]
 

 Appellant’s motion to augment the record on appeal to include the official court records of the juvenile matter in In re Ramon G. (Super. Ct. Solano County, No. J-026704) is denied.
 
 (People
 
 v.
 
 Chi Ko Wong
 
 (1976) 18 Cal.Sd 698, 711-712 [135 Cal.Rptr. 392, 557 P.2d 976] [no authority allows augmentation of criminal record to include record of juvenile proceedings not presented to trial court].) The cases cited in support of appellant’s motion to augment only concern matters contained in the superior court’s file, and do not provide authority for adding materials outside the superior court’s records.
 

 [4]
 

 The section 12022.7 enhancement was not imposed, presumably because section 1170.1 provided that only the greater enhancement shall apply.
 

 *
 

 See footnote,
 
 ante,
 
 page 820.
 

 [7]
 

 The court has explained that an enhancement adds an additional term of imprisonment to the base term, while a penalty provision specifies an increased base term for the substantive crime when specified circumstances are present.
 
 (People
 
 v.
 
 Bright
 
 (1996) 12 Cal.4th 652, 656, fn. 2 [49 Cal.Rptr.2d 732, 909 P.2d 1354].)
 

 [8]
 

 Although it recognized that, like a substantive crime, many enhancements now carry a range of three possible terms, the court noted that the fact that a statute prescribes a single term of imprisonment could be a factor in determining that a provision describes an enhancement.
 
 (People
 
 v.
 
 Rayford, supra, 9
 
 Cal.4th at pp. 9-10.)
 

 [9]
 

 We have located no CALJIC instruction regarding section 190(c).
 

 [10]
 

 Pursuant to the provisions of Evidence Code sections 455 and 459, we gave notice and a reasonable opportunity to present relevant information to the parties regarding our intent to take judicial notice of items specified in respondent’s brief and the information presented to the voters concerning sections 189 and 190.
 

 [11]
 

 “[A] statute enacted by the electorate as an initiative measure may be changed only with the approval of the electorate unless the initiative measure itself permits amendment or repeal without voter approval.”
 
 (In re Oluwa, supra,
 
 207 Cal.App.3d at pp. 445-446.) The existing
 
 *832
 
 law had been enacted by an initiative measure; therefore, any changes had to be approved by the electorate.
 

 [12]
 

 It is appropriate to take judicial notice of relevant legislative history and, where applicable, ballot arguments made to the voters.
 
 {People
 
 v.
 
 Superior Court (Romero)
 
 (1996) 13 Cal.4th 497, 504-505 [53 Cal.Rptr.2d 789, 917 P.2d 628] [extended discussion of legislative history and ballot arguments of Penal Code revisions];
 
 Mobilepark West Homeowners Assn.
 
 v.
 
 Escondido Mobilepark West
 
 (1995) 35 Cal.App.4th 32, 40 [41 Cal.Rptr.2d 393].)
 

 [13]
 

 Appellant concedes he was on notice of the drive-by allegation, because he was charged in the information with first degree drive-by murder, which requires proof that he “discharg[ed] a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death.” (§ 189.) He does not argue that notice was insufficient, and we do not address that issue.
 

 [14]
 

 The issue of a pleading and proof requirement did not arise in
 
 Bright,
 
 because the penalty provision in
 
 Bright
 
 was charged in the information and submitted to the jury with an appropriate instruction, pursuant to the statutory language.
 
 (People
 
 v.
 
 Bright, supra,
 
 12 Cal.4th at pp. 657-658.) The issue for the
 
 Bright
 
 court was whether the jury’s inability to reach a verdict barred the defendant’s retrial on the premeditation allegation. In finding that the premeditation allegation was a penalty provision, the court held that double jeopardy principles did not apply.
 

 [15]
 

 AppeIlant argues briefly that
 
 Wims
 
 was wrongly decided and that his federal constitutional rights were violated. We are not at liberty to ignore the holding of
 
 Wims. {Auto Equity Sales, Inc.
 
 v.
 
 Superior Court
 
 (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)
 

 [16]
 

 At the time of the crimes, section 12022.7 required that the defendant inflict great bodily injury “with the intent to inflict the injury.” The statute was subsequently amended to delete the intent requirement. (Stats. 1995, ch. 341, § 1.)
 

 *
 

 See footnote,
 
 ante,
 
 page 820.
 

 [18]
 

 Concurrently with the filing of this opinion in the instant case, we have filed an order denying appellant’s petition for writ of habeas corpus in
 
 In re Garcia
 
 (Apr. 30, 1998) A079560 (nonpub. opn.).